ELWOOD S. HAND *et al.*

*v.*

WILLIAM G. WADDELL *et al.*

*Filed at Ottawa April 3, 1897—Rehearing denied October 7, 1897.*

1. APPEALS AND ERRORS—*freehold is involved in action to set aside conveyance of real estate.* An appeal lies to the Supreme Court from a decree of a circuit court setting aside a conveyance of real estate on the ground of fraud and ordering a re-conveyance, as a freehold is involved.

2. SAME—*certificate of evidence need not set out exhibits verbatim.* A certificate of evidence, as originally presented and signed, is sufficient which shows that it contains all the oral testimony, stipulations and exhibits offered in evidence by both parties, although it does not set out the contents of the exhibits *verbatim,* but merely directs the clerk, in making the transcript, to insert them.

3. PRACTICE—*mere grumbling about an opponent's abstract of record presents no question.* A party deeming the abstract of record made by his opponent insufficient should make and file a further abstract, and not seek by complaints to impose upon the court the burden of reading the whole record.

4. FRAUD—*proof must be clear to set aside contract for representations not made warranties.* To justify the setting aside of a contract on account of previous representations, the truth of which the party who made them refused to warrant, the proof of their fraudulent character must be clear and cogent.

5. SAME—*representations held not to be fraudulent.* A decree setting aside a conveyance of real estate and shares of railway stock on the ground of fraudulent representations, is held, under the particular facts discussed at length in the opinion, to be contrary to the evidence and is reversed.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

CHARLES C. ARNOLD, for plaintiffs in error:

To warrant the rescission of a contract for fraudulent misrepresentations in its procurement, four conditions, at least, must concur, to-wit: First, the representation of a material fact or facts; second, the falsity of such representation; third, reliance upon it by the complaining party; and fourth, the right, in reason, so to rely.

2 Pomeroy's Eq. Jur. secs. 876-899; *Dillman* v. *Nadlehoffer*, 119 Ill. 567; *Tuck* v. *Downing*, 76 id. 71; *Development Co.* v. *Silva*, 125 U. S. 247; *Merryman* v. *David*, 31 Ill. 404.

Fraud will never be inferred, but plain proof of each and all of said conditions must be made by a clear preponderance of the evidence. *Walker* v. *Hough*, 59 Ill. 380; *Farrar* v. *Churchill*, 135 U. S. 615.

Representations, to warrant reliance, should be of a fact or facts, should be clear and plain in their meaning and reference, and should be explicit, concrete and definite, and not general or doubtful. *Tuck* v. *Downing*, 76 Ill. 82; *Walker* v. *Hough*, 59 id. 380; Kerr on Fraud and Mistake, 82.

Though material representations and their falsity have been shown, yet if it appear that after their making defendant explicitly refused to give a warranty of the conditions as thus represented, the complaining party has no right to rely upon such representations. *Dillman* v. *Nadlehoffer*, 119 Ill. 567; *Fauntleroy* v. *Wilcox*, 80 id. 477; *Bond* v. *Ramsey*, 89 id. 29.

The fraudulent character of a transfer must be shown by a preponderance of the evidence, and will not be presumed, even between persons related by marriage or consanguinity. *Shultz* v. *Hoagland*, 85 N. Y. 464; *Schroeder* v. *Walsh*, 120 Ill. 403.

Sullivan & McArdle, for defendants in error:

No freehold being involved in this case, the Appellate Court has jurisdiction, and not this court. *Banking Ass.* v. *Bank*, 157 Ill. 576; *Rucker* v. *Dooley*, 49 id. 377; *Hemstreet* v. *Burdick*, 90 id. 444; *Wing* v. *Sherrer*, 77 id. 200; *Ritchie* v. *Pease*, 114 id. 353; *Walker* v. *Converse*, 148 id. 622; *Mosher* v. *Reynolds*, 155 id. 72.

Exhibits, in equity, are a part of the record only when made part of the certificate of evidence and regularly filed with it. *Bressler* v. *McCune*, 56 Ill. 478.

Where a distinct representation is made the doctrine of notice has no application. *Antle* v. *Sexton,* 137 Ill. 410; Kerr on Fraud, 80, 81.

When false statements of material facts are made, the presumption is that the person to whom they are made relied and acted on them. *Hicks* v. *Stevens,* 121 Ill. 186.

In the presence of an actual and positive fraud, negligence of the injured party has no operation. It is beside the question if the representations were calculated to mislead, even if parties are dealing at arm's length. *Hale* v. *Philbrick,* 42 Iowa, 81; *Antle* v. *Sexton,* 137 Ill. 410; Kerr on Fraud, 80, 81; *Linington* v. *Strong,* 107 Ill. 295; *Lloyd* v. *Hughes,* 25 id. 494; Bigelow on Fraud, 523, 524, 532; *Eaton* v. *Winnie,* 20 Mich. 126; *Wannell* v. *Kern,* 57 Mo. 478; *Jackson* v. *Collins,* 39 Mich. 557; *Pomeroy* v. *Benton,* 57 Mo. 531; *Cottrell* v. *Krem,* 100 Mo. 397.

Where the parties do not stand on an equal footing, negligence of the victim in not discovering falsity cannot be allowed as a defense. *Cottrell* v. *Krem,* 100 Mo. 397.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Defendant in error William G. Waddell filed his bill in this case in the circuit court of Cook county, against plaintiffs in error, to set aside a conveyance of real estate and shares of railway stock on the ground of fraud of Elwood S. Hand in procuring the same, and praying for a re-conveyance of the property. On a hearing the court entered a decree as prayed in the bill.

We are asked to dismiss the writ of error on the ground that this court has no jurisdiction because no freehold is involved. This is a mistake. The purpose of the bill was to recover a freehold estate, on the ground that it had been obtained through fraud. The decree made a transfer of that estate by ordering plaintiffs in error to convey it within twenty days from the date of the decree. A freehold is involved.

It is also claimed that the case cannot be considered on its merits because the certificate of evidence does not purport to contain all the evidence. The certificate shows that, as presented and signed, the oral testimony therein contained, with the exhibits referred to in it and the stipulation mentioned in the decree, was all the evidence offered by either side. It was made up, according to the practice, by reciting that a paper was offered in evidence and marked as a certain exhibit, followed by a direction to the clerk, in making the transcript, as follows: "(Here insert.)" The clerk, in making the transcript, inserted the exhibits in their proper places, according to that direction. In *Garrick* v. *Chamberlain*, 94 Ill. 588, it was said of that method: "That has been the practice for more than forty years, where bills of exception refer to matters which can be identified. We see nothing wrong about it." The stipulation referred to in the certificate was entered into in open court and embodied in the decree. The transcript of the record is complete, and there is no basis for the objection.

There is also complaint that the abstract does not recite the evidence as fully as it should. It apparently shows the evidence fully enough for a fair consideration of the case, and if there are any omissions of evidence which defendants in error deem important they should have made a further abstract. They had the privilege of making such additional abstract, but a party cannot impose upon the court the labor of reading the record, by finding fault with the abstract filed; and grumbling about it does not present any question for the action of the court.

The conveyance of the real estate and transfer of the stock were made in consideration of the assignment by the defendant Elwood S. Hand to the complainant William G. Waddell of a lot of advertising contracts, called "Building trades credits." Each of these contracts provided for an advertisement of one or more pages in a

book descriptive and illustrative of some conspicuous building, like the Masonic Temple or Auditorium in Chicago, and was payable to the order of Elwood S. Hand in trade, on publication of such book and delivery of a specimen copy or a certain number of copies. There were provisions annexed or endorsed showing the manner of payment to be by deducting the amount as a credit on the price of work or material such as the signer performed or dealt in, and payment was contingent on such work or material being obtained. Most of them provided that the amount of the advertising contract was to be deducted from the contract price for work other than what the maker had estimated on or contracted for, prior to the date of the contract. The business was conducted for complainant by his agent, George W. Henry, who testified that this was a recognized method of advertising which had long been in use; that it had been in vogue ever since he could remember, and that it was a very nice form of advertising. The advertisers get up the book and call it a souvenir of the building, describe the different classes of work, state who did each part and praise it without stint, and each person or corporation is given a page or more of advertisement, which is paid for by a credit on other new work. There were about a hundred and fifty-five of these contracts, aggregating a total of $42,317.50, which were exchanged for the real estate in Chicago subject to a mortgage and three hundred and twenty-five shares of Wabash railroad preferred stock. The negotiations began in May, 1892, between Elwood S. Hand and George W. Henry, who was then acting for himself. Hand offered the contracts at a large discount of twenty-five or thirty per cent for cash, and they were estimated in the final exchange at a discount of perhaps twenty-five per cent. Soon after the negotiations commenced Alexander White appeared as an associate of Henry, and interested in some proposed warehouse and in the formation of a corporation for its erection. The

negotiations continued up to the 10th or 12th of July, 1892, and the parties saw each other frequently during that time about the matter. During the time that the negotiations were pending, Henry and White had in their possession lists of the contracts showing the names, addresses and business of the makers, the number and amounts of the contracts, and the Chicago office of such as were non-resident and had such an office. Henry saw several of the contracts and understood the general nature of them, both from such examination and from previous experience in Kansas City. He had been concerned in the Midland Hotel Company at Kansas City, which company had obtained similar contracts from Hand and made use of them there. Hand testified that White examined the contracts for three-quarters of an hour one day and about two hours at another time, and had copies of six or seven of them. White denied that he made such examination. Waddell was a contractor, and he was to take the credits, get the contract to build the cold storage warehouse and take part of the stock in the corporation. White was to be an officer and Henry proposed to be interested in the concern. The standing of the makers of the contracts was investigated as appearing in the reports of a mercantile agency, and Henry testified that in the list were persons that he knew personally, and he knew that a credit on their books would be good. The exact relation of White to the transaction, further than above stated, does not appear, and it was finally closed up by Henry July 12, 1892, acting as the agent of Waddell. At that time the contract for the exchange was executed, and by it Waddell agreed to convey the real estate and railroad stock to Hand, and Hand agreed to assign the contracts to Waddell. The deed, stock and contracts were to be deposited with the Northern Trust Company until the title to the real estate could be examined, and both parties were to pay Henry a commission for negotiating the contract.

Aside from the foregoing provisions, the contract contained the following: "The said advertising contracts being subject to the conditions incorporated therein, endorsed thereon and otherwise attending same. The said Hand especially agrees, however, to make good any and all of the said advertising contracts if the same shall be lost or rendered worthless by reason of the insolvency of the maker or makers thereof, provided said insolvency, through assignment for the benefit of creditors, or other public acknowledgment of same, transpires within one year from the date hereof, but all other or further obligations or liability for or on the said advertising contracts, as delivered, according to the terms hereof, is hereby by the said Hand expressly denied, and the said Hand is hereby by the said Waddell expressly released from any and all such further obligation or liability of whatsoever kind, except as hereinafter provided. The said Hand agrees to have set over and made applicable to the payment or payments for specific work upon the written request of said Waddell, such of said advertising contracts as are endorsed non-transferable 'and such advertising contracts applicable to hotel or apartment buildings,' and for such of the advertising contracts as are applicable to hotel or apartment buildings the said Hand further agrees to become, upon the written request of the said Waddell, a nominal stockholder in any syndicate or company organized for the purpose of erecting a building in which it is intended to employ the said advertising contracts as credits on material and workmanship."

All the parties were men of wide business experience. Henry, who negotiated the trade as agent of Waddell, was a man of mature years, who had been a broker and also in the lumber business. He was president of an oil company, and his trade as a broker aggregated many millions. He testified that he negotiated $100,000 worth of business every month in the year, and did $4,000,000

worth of business in the year 1891. There was no concealment of the character of any of the contracts. They were open to examination, and no artifice was employed to divert any proposed inquiry, and the negotiation was pending for a long time, so that there was ample time and opportunity for investigation and inquiry. Whatever Hand may have said about the credits before the execution of the contract to exchange, when it came to be drawn he expressly refused to warrant anything beyond the agreement in that contract to make good any insolvencies within one year, and by the contract Waddell expressly released him from any and all further obligation or liability of whatsoever kind. This agreement was the culmination of all the previous negotiations and representations concerning the subject of the exchange. After that refusal by Hand and release by Waddell there were still ten days before the exchange was made. Surely in such a case, if the contract may be set aside on account of previous representations, the truth of which the party has expressly refused to warrant, the proof of their fraudulent character should be clear and cogent.

Counsel are agreed that in order to set aside this transfer for fraud it was necessary for complainant to allege and prove the representation by Hand of a material fact which was false and upon which complainant relied, and had a right, in reason, to rely. The statements which it is claimed that Hand made to Henry which were material to the transaction and false, are, that the credits could be used in Chicago; that those by out of town parties were by persons who figured on work in Chicago; that they could be used on any building, except those which were limited to hotels or apartment buildings; that he had carried out his contracts, and that they were negotiable and good for their face. That the first representation was made by Hand was admitted. Some of the contracts were made by persons or corporations outside of the city of Chicago, and he does not deny

that he said they could be used in Chicago. There is no evidence that they could not be used there. Waddell made no effort to use them. There is no reason to suppose that advertisers doing business elsewhere would not be as willing to take contracts or sell their wares in Chicago as any other place, and in the absence of any proof that the statement they would do so was false it cannot be assumed to be so. The only argument of counsel that the statement was false is based on the fact that some of the contracts were dated at other places. The list furnished showed Henry that fact, so that complainant was fully informed of it. That list showed the place of business of the non-resident parties and the Chicago office of such as had an office there, and neither Henry nor Waddell was deceived or misled as to the contracts that were made in other places. If there was any legal consequence resulting from that fact they are chargeable with the knowledge of it.

Neither did Hand deny that he represented that the credits not limited to hotel or apartment houses could be used in any building. It is claimed that this statement was false on account of limitations in some of the contracts as to the building. Some of them referred to the building as being in contemplation, or a proposed building, or something of that kind, but they were not limited to any specific site or location or any identified building, and we see no reason why they could not be used on any building. Some of them were to be buildings in which Hand was interested; but the parties understood this, and in the written contract Hand agreed to become a nominal stockholder in any syndicate or company organized for the purpose of erecting a building in which it was intended to employ the advertising contracts as credits on material and workmanship. This provision would enable the parties to use the contracts, and the representation was not fraudulent.

The remaining representation to Henry alleged was, that Hand said he had carried out his contracts, and that they were negotiable and good for their face. On this question Henry testified that Hand did not say whether the contracts were subject to dispute or denied by their makers, but that he did say he had performed his contracts, had delivered books to the parties, and had express receipts and would produce them. Hand denied that he said he had performed his contracts, and said that he told Henry his evidence of fulfillment was the express receipts for books delivered. A few of these contracts were endorsed as not transferable without the consent of the makers, but there is an entire absence of evidence that the makers refused to give the credit provided for to an assignee of Hand. These contracts were mentioned in the written agreement, and Hand agreed to have them set over and made applicable to the payment for specific work upon the request of Waddell. And so, also, as to the contracts being worth their face. This was the subject of an express stipulation, by which Hand agreed to make good all that should be lost by insolvencies within one year. It is plain that there was a specific and well understood agreement on those subjects, and that the alleged representations will not sustain a charge of fraud.

Taking Henry's version of the statement as to performance of the contracts to be correct, the evidence that it was false and fraudulent is insufficient. There were a great number of the contracts, and it will not do to say that Hand was guilty of a false and fraudulent misrepresentation because of some error in the form of an advertisement, or because it should happen that duplicates should in rare instances appear in the contracts, or that some other defense could be made to a trifling number. That was the sort of evidence produced to sustain the charge. In one or two the advertisement was claimed not to be as furnished to Hand. Another witness said the

contract was not valid because only the name of the corporation was signed, and it did not show by what officer the name was signed. The witness who testified was the president of the corporation, and said that he signed the corporate name to the contract himself, but that it was not good because it did not show on its face that he signed it. Other witnesses were produced who did not want to carry out their contracts. These people said that they had been over-persuaded by Hand; that he had represented great prospective benefits that would result from the advertising; that he said he had influence with the architects and with people who were going to build and would aid them in getting contracts, and they offered other like lame and insufficient excuses for not performing the contracts. With the exception of a very few there was not a semblance of a legal excuse for non-performance. The contracts were mostly made in 1890 and 1891, and when the makers were called and examined in 1895 they had lost all interest in them, and naturally manifested anxiety to get rid of paying them.

There was a further statement relied upon alleged to have been made when the exchange took place, ten days after the agreement was entered into. Henry had gone out of town and left instructions with Herve Ferbrasche, his book-keeper, to check over the contracts with the list left with him by Henry, and to receive the contracts from Hand and pass them to Waddell, and deliver the deed and stock to Hand. Ferbrasche testified that in checking them to see if they corresponded he thought some of them were not transferable, and hesitated about completing the trade, when Hand said that Henry had seen them, and he went on with the checking and exchange. What Ferbrasche found on any of these contracts which made him hesitate is not shown, but that there was anything appearing on any one of them which Henry did not understand is not proved or at all probable. Henry had made the contract. He had held a list

for a long time, and knew that some of them were not transferable and would have to be made applicable through the intervention of Hand, as expressly provided in the contract. There is nothing whatever shown in the evidence or intimated in the argument which Ferbrasche discovered that Henry did not well understand. The only authority of Ferbrasche, as book-keeper, was to check over the contracts with the list, and everything indicates that if Henry had been there they would have been taken without question. Whether Henry had seen each contract or not, there is no evidence that there was anything on or about any one of them that he did not understand as fully as though he had seen and read it, and if the statement was made it was in effect true. As the character of the contracts had already been passed upon by Henry, the statement that he had seen them amounted to the same thing in substance.

This is the whole showing of fraud on which the court is asked to rescind a contract where the party making it expressly refused to warrant anything, the party to whom it was made expressly released him from any liability beyond that assumed in terms in the writing, and the parties were on equal terms and entirely competent to contract for themselves. We think it insufficient, giving credence to everything upon which the chancellor was justified in placing any reliance. Waddell knew nothing about the business, but left it entirely to Henry, and it was through Henry's representations that he made the purchase. Henry testified that he expatiated, as most brokers do, in regard to the credits, what Waddell could make out of them and the discount he could get off, and finally got him into the contract. Henry may have colored things to Waddell, but if he did, Hand was not responsible beyond his own representations. Henry was not his agent, but was assuming to act for himself, or with White as an associate, until near the close of the transaction, when he represented Waddell in the agree-

ment under which the conveyance was made. This conveyance came from John A. Thomson, the other defendant in error, who was not shown to have any other connection with the affair. After the exchange was made there was no effort whatever to use the advertising contracts in any building. Hand was never called upon to make any of them transferable which were not so by their terms, or to become a nominal stockholder, as provided in the contract, so as to make use of any of them, or to make good the small number to which defenses were alleged, but this bill was filed September 7, 1892, to set aside the whole transaction for fraud, and it was followed by the decree setting it aside and ordering a reconveyance to said John A. Thomson. We do not think such a decree was justifiable, and it will be reversed and the cause remanded, with directions to dismiss the bill.

*Reversed and remanded.*